Leon A. BROWN, Plaintiff–Appellant,

v.

**CITY OF SOUTH BURLINGTON, VER-MONT, Charles Hafter, Individually and as City Manager, City of South Burlington, and Michael O'Neil, Individually and as Chief Engineer, City of South Burlington, Defendants–Appellees.**

Docket No. 03–9060.

United States Court of Appeals, Second Circuit.

Argued: Aug. 25, 2004.

Decided: Dec. 29, 2004.

Edwin L. Hobson, Burlington, VT, for Plaintiff–Appellant.

Steven A. Bredice, Unsworth, Powell, Barra, Orr & Bredice, PLC, Essex Junction, VT, for Defendants–Appellees.

Before: MESKILL, MINER, and KATZMANN, Circuit Judges.

MINER, Circuit Judge.

Plaintiff-appellant, Leon A. Brown, appeals from a summary judgment entered in the United States District Court for the District of Vermont (Murtha, *J.*). The judgment was entered in favor of the defendants-appellees: the City of South Burlington, Vermont (the "City"), which had employed Brown as a firefighter; Charles Hafter, City Manager; and Michael O'Neil, City Fire Chief, designated in the caption as "Chief Engineer" (collectively, "Defendants"). Brown brought the action giving rise to the judgment for the purpose of recovering damages for the wrongful termination of his employment. His claim for wrongful discharge was predicated upon the First Amendment, the retaliation ("whistleblower") provision of the False Claims Act ("FCA"), and Vermont State law. In granting summary judgment, the District Court held that Brown had ratified a release of all claims that he had executed in favor of Defendants prior to commencing the action. The District Court determined that Brown was barred from repudiating the release by reason of his failure to tender back in a timely manner the consideration he had received for it.

## BACKGROUND

The termination of Brown's employment had its genesis in an anonymous letter (the "Letter"), which apparently was sent in January of 1999 to the various individuals, news media outlets, and agencies named therein as addressees. The Letter reads as follows:

Remember the 1998 Ice Storm!

The South Burlington Fire Chief, Mike O'Neil using invoices from the South Burlington Firefighter's Association for it's [sic] own power.

Obtaining FEMA currency for personal use, by submitting claims for meals which never conspired [sic], 299 meals in fact.

Not even one meal from any such service was ever supported or existed.

This S.B. Fire Chief has hurt this department in such a short amount of time. Why do you think so many of us on-call firefighter's [sic] have moved on. Look at the interior qualified firefighter list when the Chief started and look at the list today.

cc. South Burlington City Council: William Cimonetti, James C. Condos

South Burlington City Manager: Chuck Hafter

WCAX–TV ch3: News room

WPTZ–N ch5: News room

Burlington Free Press: News room

Federal Bureau of Investigation

Federal Emergency Management Agency

The ice storm referred to in the Letter occurred in January of 1998 and caused extensive damage throughout northwestern Vermont, including the City of South Burlington. On January 26, 1998, President Clinton declared Vermont a federal disaster area eligible for public assistance funds under the Disaster Relief Act, 42 U.S.C. § 5121 et seq. The Federal Emergency Management Agency, popularly known as FEMA, was the federal agency responsible for administering the federal disaster funds made available to the City. In addition to claims for other services performed, the City sought and received reimbursement for 299 meals provided to firefighters during ice storm operations. According to the Letter, no such meals were provided, the invoices for the meals were false, and Fire Chief O'Neil was responsible for the claim. Those referred to in the Letter as "on-call" and "interior qualified" firefighters were the City's unpaid volunteer firefighters, whose numbers were said to have been diminished due to dissatisfaction with the Fire Chief. The Letter purported to be written by an unnamed on-call firefighter.

The Letter generated a number of inquiries and reports. In a letter dated January 26, 1999, Scott A. Merchant of the South Burlington Firefighter's Association ("S.B.F.F.A."), responding to an inquiry by Chief O'Neil, reported that "[t]he actual receipts were lost in the confusion of various people picking up the meals." Invoices "based upon estimates" therefore were sent to FEMA "as receipts" to support the meal expenses claimed. The letter concluded: "It is very disheartening when someone attacks the credibility of an organization such as the S.B.F.F.A. and South Burlington Fire Dept, who has [sic] done countless things to support and contribute to the community they serve."

By memorandum to City Manager Hafter, dated January 29, 1999, Chief O'Neil reported that he had "reviewed the documentation" submitted for the reimbursement and had discussed the documentation requirements with FEMA representatives. O'Neil reported that he had turned over to FEMA the "copies of the receipts" received from Scott Merchant. By memorandum to John McGough of FEMA Region 1, dated February 2, 1999, FEMA Inspector Frederick J. Costello reported that he had investigated the meal reimbursment claim described in the Letter and "found all records to be in order" and "kept in accordance with FEMA Region 1 Guidelines." He concluded his report as follows: "Fire Chief Michael O'Neil says the anonymous [L]etter is currently under investigation."

The investigation referred to was undertaken by the City Police Department and, apparently, was instigated by City Manager Hafter, to whom a copy of the Letter had been sent. Detective Gary Small was assigned to the case. He interviewed Chief O'Neil, who reported his suspicion

that a paid firefighter, Leon Brown, had written the Letter. The Chief said that Brown was "upset" and "unhappy" about a number of problems in his life—a low score on a promotion exam; injuries sustained in a car accident; an extended sick leave resulting from the accident; and extensive damage to his house as the result of a fire next door.

Detective Small also interviewed Captain Ken Dattilio, who was Brown's supervisor in the fire department. Dattilio related that he, too, suspected that Brown was the Letter's author. Dattilio opined that Brown "had been depressed lately," referring to some of the same problems cited by Chief O'Neil. Dattilio was of the opinion that Brown felt hated by Chief O'Neil and "may have had something to do" with the "false claims involving Chief O'Neil." Dattilio also noted that "Brown had been on some medication because of his health issues." Detective Small's investigation included a comparison of envelopes and labels sent from the Brown residence with the envelope and label used for the Letter.

On February 9, 1999, Detective Small and Captain Dattilio interviewed Leon Brown. Early in the interview, Brown said: "I feel relieved that the [L]etter has come to [sic] and admitting it, yes, I did type it up and I am the only one that acted on it and I am very sorry for ever doing it." In the interview, Brown went on to describe his perceived problems with Chief O'Neil; the damage to his house as a cause of financial difficulties; a serious automobile accident and consequent extended sick leave; and a poor showing on his promotion examination. When asked whether "the Chief had any involvement illegally with any of the funds from FEMA," Brown responded that he did not know but that no meals had been provided and that Sonny Audette, the Emergency Management Coordinator at the Fire Department, had "contest[ed] signing the slips" for the meal reimbursement.

By confidential memorandum to City Manager Hafter, dated February 16, 1999, Chief O'Neil provided an "update" on the investigation into the Letter. The Chief noted that the Letter had accused him of "certain improprieties" and that the accusations "ha[d] proven to be false." The Chief, reporting that Brown had admitted to writing the Letter, noted that various members of the department felt that, because Brown wrote the Letter, they would be unable to trust him or to work with him. Brown's attempt to cast responsibility for the Letter on the "call staff" by referring in the Letter to "us on-call firefighter's [sic]" was also cited as detrimental to fire department morale. Reporting that the members of the fire department considered Brown untrustworthy and that he had "brought shame and disgrace" on the department by writing the Letter, Chief O'Neil recommended that Brown's employment be terminated.

By letter dated February 16, 1999, Brown was advised by City Manager Hafter that he had received the recommendation and that he would be conducting his own "inquiries." Thereafter, Hafter apparently gave Brown the option of resignation or termination. By letter dated March 12, 1999, Brown resigned from the fire department and executed a general release (the "Release") of all claims against the City in consideration of the payment of $7,964.70. In a letter dated the same day, Hafter accepted Brown's resignation and set forth an hourly breakdown of items for which Brown was paid. These items included accrued vacation time, compensatory time, two weeks severance pay, two weeks sick leave, and an item designated "personal leave." Other than the two weeks severance pay, it ap-

pears that all the items were due any employee of the City upon termination of employment.

After his resignation, Brown continued to press FEMA for further investigation of the claim for meal reimbursement. A further investigation was conducted, and FEMA determined that the claim was indeed fraudulent. Sometime thereafter, it became apparent that O'Neil and Hafter were involved in the scheme. Hafter, knowing that the meals had not been provided, had authorized the false claim to proceed, likening it to a grant application. O'Neil had acquired the proceeds of the claim through the F.F.A. had used the money to purchase exercise equipment in Canada for the fire department. Consequently, a complaint in an action against the City was filed by the United States Attorney for the District of Vermont on behalf of the Government under the False Claims Act, seeking treble damages and a civil penalty. According to the complaint, the City's claim for disaster relief included a reimbursement of $870 for 299 meals that never were provided. The City stipulated to the entry of judgment in the action in the sum of $2,500 on October 27, 2000.

By memorandum to City Manager Hafter dated January 10, 2001, Brown sought to be reimbursed for additional earned sick time that he claimed to have accumulated through March of 1999. In the memorandum, he reviewed the events that led to his dismissal and noted that his allegations of fraudulent meal claims had been proved correct by the later FEMA investigation. Having received no response, on October 15, 2001, Brown filed a complaint (the "Complaint") in the United States Court for the District of Vermont, thus commencing the action giving rise to this appeal.

Defendants moved for summary judgment in the action, and the motion was referred to Magistrate Judge Jerome J. Niedermeier for a report and recommendation. The Magistrate Judge undertook a thorough examination of all of the issues presented in the motion for summary judgment and, on April 7, 2003, filed a detailed, thirty-seven-page report and recommendation (the "First Report").

As to Defendants' contention that Brown was barred by the Release from asserting any of his claims, the Magistrate Judge found a triable issue as to Brown's assertion that he was induced to sign the Release by Defendants' fraudulent misrepresentations made in connection with the meal reimbursement cover-up. The Magistrate Judge therefore recommended that the court deny summary judgment on the issue of the validity of the Release. Addressing the False Claims Act, Vermont state-law wrongful termination, and First Amendment claims, the Magistrate Judge recommended granting summary judgment in favor of Hafter and O'Neil in their individual capacities. The Magistrate Judge reported (i) that the claim of retaliatory discharge under the False Claims Act had to be dismissed as against the individual defendants because individual supervisors are not employers under the Act; (ii) that the Vermont state law claim for wrongful termination should have been brought against the municipality rather than the individuals, pursuant to a Vermont statutory provision; and (iii) that the individual defendants were entitled to qualified immunity on Brown's First Amendment claim because they had acted in good faith in discharging Brown on the basis of a reasonable fear of disruption and on an objectively reasonable belief that they could lawfully terminate Brown's employment because of the potentially disruptive effect of the Letter.

With respect to the merits of the First Amendment claim, the Magistrate Judge recommended summary judgment in favor of Defendants. The Magistrate Judge reported that "an anonymous letter publicizing internal grievances would be cause for discharge absent the protected speech" and that "Defendants could reasonably believe that an anonymous letter" asserting the dissatisfaction of on-call firefighters "could lead to strife within the [fire] department." The First Report further indicated that Defendants had performed an adequate investigation regarding the potentially disruptive nature of the speech.

The Magistrate Judge recommended denial of Defendants' summary judgment motion, however, insofar as it pertained to the False Claims Act retaliation claim and the Vermont state law claim. The Magistrate Judge reported that there was a triable issue as to whether Brown's discharge was a retaliation for the protected activity of protesting a false claim. The First Report noted that there was no authority allowing a defendant to avoid the retaliatory discharge claim under the False Claims Act upon a mere showing that a letter describing a false claim would be disruptive. The Magistrate Judge was of the opinion that Vermont would recognize an exception to the at-will employment rule of that state in a case for retaliation against a whistleblower and that a factual question was sufficiently presented for the Vermont state law claim to survive the summary judgment motion.

On May 8, 2003, in a two-page, unpublished opinion ruling on the parties' objections to the First Report, the District Court addressed only the issue of the Release. The court agreed that Brown had raised genuine issues of fact as to whether the Release was procured by fraud. The court noted, however, that in their motion for reconsideration of the First Report

(treated by the Court as a timely objection to same), Defendants argued that Brown had failed to tender the consideration he received for the Release and that this failure constituted ratification of the Release. Since this argument had not been raised before Magistrate Judge Niedermeier, the District Court, by order dated May 8, 2003, recommitted the matter to the Magistrate Judge "to determine whether the argument [had] been properly raised . . ., its merits, and its effect, if any, upon [Brown's] remaining claims."

On August 27, 2003, in a fifteen-page report and recommendation [the "Second Report"] responding to the recommittal order, the Magistrate Judge, having found that the defense of ratification was properly raised and established, recommended summary judgment in favor of Defendants on the basis of the Release. The Magistrate Judge determined that, although not specifically raised as a defense, ratification could be considered to be included in the defense of release. Moreover, the Magistrate Judge recommended that if the ratification defense could not be inferred as interposed in this way, then Defendants' motion to amend their answer to include the defense should be granted.

The Second Report noted that proper consideration had been given for the Release, including payment for two items to which terminated employees ordinarily were not entitled: two weeks severance pay, to which Brown admitted he was not entitled, and unused sick leave. The Magistrate Judge reported that any economic duress rendering the Release ineffective would have been removed by October 16, 2000, by which time Brown was reemployed and had received a substantial settlement on the claim arising from the automobile accident in which he had been injured. The Magistrate Judge also reported that Brown "knew of the purport-

ed misrepresentations by January 1, 2001, when he wrote a letter to ... Defendants demanding additional money." The Second Report stated that because Brown did not offer to tender back the consideration until May 8, 2003, long after he knew of the alleged misrepresentations in regard to the Release, and after removal of any economic duress, the tender back offer was untimely, and the ratification defense should therefore be sustained.

On September 25, 2003, in a seven-page, unpublished opinion, the District Court ruled on Brown's objections to the Second Report. The court rejected the objection to the timeliness of the ratification defense, agreeing with the Second Report that there was no undue delay or prejudice in allowing Defendants to amend their answer to raise that defense. The second objection, that the Release was void as against public policy, was rejected because releases of private claims under the False Claims Act are permitted. As to the third objection, the District Court found that there was ample support in the record for the Magistrate Judge's conclusion that any economic duress ceased when Brown obtained other employment and settled his personal injury lawsuit. The fourth objection, that there was no consideration for the Release, was rejected for the reasons given in the Second Report.

As for the final objection, that the defense of ratification is inapplicable because ordinary contract principles do not apply to releases under the False Claims Act, the District Court ruled that the tender-back rule does indeed apply to claims under the False Claims Act and that Brown's attempts to tender back the consideration, nearly two-and-one-half years after he discovered the alleged misrepresentations, were untimely. Accordingly, the District Court directed the entry of summary judgment for Defendants. This appeal followed.

## DISCUSSION

### I. Limiting the Review

Because the District Court determined that all claims asserted in the Complaint were barred by Brown's ratification of the Release by failure to tender back the consideration received in a timely manner, we address only that determination. We find it unnecessary either to pass on any other issue raised on the motion for summary judgment or to comment on any of the recommendations included in the First Report. We likewise decline to comment on the rulings of the District Court in response to that Report, except as they pertain to the issue of ratification.

### II. Ratification and Tender Back

"A release is a contract." *Economou v. Economou,* 136 Vt. 611, 619, 399 A.2d 496 (1979). In the contractual context, ratification, as relevant here, is defined in modern legal usage as "[a] person's binding adoption of an act already completed but ... not done in a way that originally produced a legal obligation." *Black's Law Dictionary* 290 (8th ed.2004). On appeal, Brown argues that his act of executing the Release did not produce a legal obligation on account of Defendants' alleged misrepresentations. Further, Brown denies that he ever adopted the invalid Release with the intention of being bound by it.

■ It is a generally accepted principle that a voidable contract can be cured by ratification through express or implied conduct, but that a person "charged with ratification of such a contract must have acted voluntarily and with full knowledge of the facts." 17A *Am.Jur.2d Contracts* § 11 (2004). Moreover, a party asserting the defense of ratification of a voidable

contract ordinarily must demonstrate that the releasor intended to ratify the agreement. *See* M.C. Dransfield, Annotation, *Ratification of Contract Voidable for Duress*, 77 *A.L.R.2d* 426 § 4 (1961) ("While a contract voidable for duress may be ratified, either by express consent, or by conduct inconsistent with any other hypothesis than that of approval, still the intention to ratify is an essential element and is at the foundation of the doctrine of waiver or ratification."); *see also Kovian v. Fulton County Nat'l Bank & Trust Co.*, 857 F.Supp. 1032, 1040 (N.D.N.Y.1994) (holding that the issue of intent to ratify a release was a question of material fact). With respect to ratification of a release by conduct, the test is "whether the releasor, with full knowledge of the material facts entitling him to rescind, has engaged in some unequivocal conduct giving rise to a reasonable inference that he intended the conduct to amount to a ratification." 66 *Am.Jur.2d Release* § 27 (2001). Where money paid as consideration for a fraudulently acquired release is retained after the releasor becomes aware of the fraud, ratification may be found. *See id.*

In order to avoid a finding of ratification where consideration has been paid, it is essential that the releasor tender back the sum received. The rule requiring the tender of consideration received, as a condition to rescission of a contract such as a release, is said to be a general principle of the common law of contracts. *See Fleming v. United States Postal Serv.*, 27 F.3d 259, 260 (7th Cir.1994). In *Fleming*, the plaintiff had executed a release of Title VII and Rehabilitation Act claims in consideration of the payment to her of the sum of $75,000. She sought to have the release set aside, but never tendered back the consideration received. The court concluded that the absence of a tender was fatal to Fleming's claim. *Id.* at 262.

■ The same requirement for the tender back of consideration received is applied in Vermont: "When one has received anything of value in settlement of a right of action, and he desires to rescind, he must return the consideration received insofar as it lies within his power to do so. Absent such an offer, the contract of settlement is a bar to recovery." *Economou*, 136 Vt. at 620, 399 A.2d 496. In a case that hinged on a failure to comply with a Vermont statute providing for the disavowal of a release of claims for personal injury, the Vermont Supreme Court held that "the statutory remedy [was] unavailing because the first time plaintiff invoked the statute—during this appeal—[fell] outside the three-year limitations period, and *plaintiff ha[d] not returned the consideration as required.*" *Maglin v. Tschannerl*, 174 Vt. 39, 44, 800 A.2d 486 (2002) (emphasis supplied).

■ In an opinion issued nearly a century ago, but never modified, distinguished, or overruled, the Vermont Supreme Court provided detailed guidance on the time frame for disaffirmance of an allegedly fraudulent contract. *See Ward v. Marvin*, 78 Vt. 141, 62 A. 46 (1905). *Ward* was an action by the purchaser of a horse to rescind the purchase, and the court held that the right to rescind was lost because the plaintiff continued to work the horse after discovering that the horse was not as represented. The rule was stated as follows:

> All the law requires is that [the rescindor] shall act within a reasonable time after the discovery of all the essential elements of the fraud. *How* promptly one must act to be within this rule of law depends upon the circumstances of each particular case, and when there are no facts involved but the simple one of the length of time elapsed, it is a question of law. But when disputed facts, involving questions of excuse, discovery of fraud,

and like matters, as in this case, are to be passed upon, the question is a mixed one of law and fact, and is for the jury. This is the settled law of this state .... There was nothing in this case to take it out of the general rule, and there was no error in submitting the case to the jury on that question.

*Id.* at 143–44, 62 A. 46 (citations omitted).

The need to act within a reasonable time finds expression through a more contemporary formulation of the rule in the Restatement of Contracts:

> The power of a party to avoid a contract for misrepresentation or mistake is lost if after he knows of a fraudulent misrepresentation or knows or has reason to know of a non-fraudulent misrepresentation or mistake he does not within a reasonable time manifest to the other party his intention to avoid it.

*Restatement (Second) of Contracts* § 381(2) (1981).

According to the Restatement, the determination of what constitutes a reasonable time is informed by the following factors:

> (a) the extent to which the delay enabled or might have enabled the party with the power of avoidance to speculate at the other party's risk;
>
> (b) the extent to which the delay resulted or might have resulted in justifiable reliance by the other party or by third persons;
>
> (c) the extent to which the ground for avoidance was the result of any fault by either party; and
>
> (d) the extent to which the other party's conduct contributed to the delay.

*Id.* § 381(3). Indeed, the Restatement advises, in light of the foregoing, that "what time is reasonable depends on all the circumstances, including the extent to which the delay was or was likely to be *prejudi-*

*cial* to the other party or to third persons." *Id.* cmt. a (emphasis supplied).

Avoiding a contract of release on the ground of fraudulent misrepresentation, then, requires not only manifestation of an intention to avoid the release within a reasonable time after discovery of the fraud but also return of any consideration received by the releasor within a reasonable time. 66 *Am.Jur.2d Release* § 46 (2001). According to the general rule, "[w]hether the return was timely is ordinarily a question of fact." *Id.* § 46 & n. 2. Tenders of consideration have been held timely even where they were made after commencement of an action and even at trial on the original claim. *See id.* § 46 & nn. 3–6; *see also* H. Havighurst, *Problems Concerning Settlement Agreements,* 53 Nw. U.L.Rev. 283, 311–13 & n. 100 (1958) (noting that it has been the practice of some courts to allow plaintiffs to tender back consideration for settlement agreements just prior to, or even during, trial; and citing a "substantial number of courts" holding "that, although the release [was] voidable and not void, tender [was] unnecessary").

### III. *The Analysis Required*

■ In accordance with the foregoing, factors other than the passage of time between the discovery that a release was fraudulently induced and the disaffirmance of the release and return of any consideration received should also inform a finding of ratification. While a lengthy passage of time *may* be a significant factor, it is not necessarily controlling. The District Court determined, without further analysis, that the period of two years and five months between the time Brown became aware of the alleged misrepresentations (at the conclusion of FEMA's second investigation) and the tender back of the consideration (during the litigation) was a sufficient basis for a finding of ratification. It

seems to us that a more detailed analysis of the situation is warranted in this case.

Any examination of reasonableness in this case must take into account that the action was commenced within nine months after Brown had notice of the alleged fraudulent misrepresentations that induced him to sign the Release. Although the validity of the Release was put into issue by the pleadings, and the defense of release was apparent, the specific issue of ratification was not put into play until Defendants' motion for reconsideration of the First Report. That motion did not occur until after the filing of the Second Report on April 7, 2003, approximately one-and-a-half years after the action was commenced. After the motion for reconsideration was filed, Brown made three unsuccessful efforts to return in full the consideration paid to him for the Release. These efforts stand in stark contrast to those of releasors in cases where no attempt to tender back the consideration ever was made. *See, e.g., Fleming,* 27 F.3d at 261–62 (finding the absence of tender fatal where a party seeking to invalidate a release "has made no offer to return the money, let alone an offer supported by sufficient assurances [of payment] to be credible").

Any analysis of Brown's delay in making the necessary tender must also take into account the fact that Defendants were on notice of Brown's intention to disaffirm and rescind the Release as soon as they were served with the Complaint. The Complaint challenged the validity of the Release within nine months after Brown became aware that he was induced to sign it by Defendants' representations that reimbursement for the meals was proper and that Brown's allegations to the contrary were not only false but disruptive to the fire department.

In this context, it is significant that the False Claims Act, the basis for Brown's central claim, was designed by Congress to protect against retaliation the class of whistleblowers whose activities benefit the public fisc. *See generally* Stephen M. Kohn, *Concepts and Procedures in Whistleblower Law* ch. 6 et seq. (2001). Notably, in applying and construing certain other federal statutes with analogous purposes, the Supreme Court has dispensed with the tender-back requirement altogether. *See, e.g., Oubre v. Entergy Operations, Inc.,* 522 U.S. 422, 428, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998) (no tender back required, because Congress specifically provided in the Older Workers Benefit Protection Act, Pub.L. 101–433, § 201, 104 Stat. 978, 983 (1990) (codified at 29 U.S.C. § 626(f)), for the federal regulation of releases given upon termination of employment of certain older workers); *Hogue v. S. Ry. Co.,* 390 U.S. 516, 517, 88 S.Ct. 1150, 20 L.Ed.2d 73 (1968) (tender back not required of a claimant under the Federal Employers' Liability Act, 45 U.S.C. §§ 51 et seq., because it is "more consistent with the objectives of the Act to hold … that it suffices that … the sum paid shall be deducted from any award determined to be due to the injured employee"). With regard to retaliation actions brought under the False Claims Act, however, Congress provided no relief from the common law rules governing tender and ratification.

In assessing the reasonableness of Brown's delay in tendering back the consideration he received for the Release, some attention must be given to the fact that Brown was entitled to the greater part of the money he received for signing the Release. Of the $7,964.70 paid to Brown, only the portion attributable to severance pay was not an entitlement for every terminated employee. We have held that "[a] release is not effective unless the party giving the release receives some-

thing of value to which the party was not otherwise entitled." *Chaput v. Unisys Corp.*, 964 F.2d 1299, 1301 (2d Cir.1992). In *Chaput*, the plaintiff argued that there could be no ratification through his failure to tender back the consideration he received for the release that he signed, because he received only the benefits of employment to which he was entitled. We found that "[a]lthough the matter [was] close, the evidence in the record [was] sufficient to allow a trier of fact to find that [the plaintiff] did not receive valid consideration." *Id.* at 1302.

Here, Brown himself has admitted that some of the money he received is not included in the entitlement of every terminated employee of the fire department. Accordingly, consideration was paid for the Release even if it was only a small part of the money paid to Brown. Although a tender back of that portion of the amount paid was necessary to avoid ratification, any assessment of the reasonableness of the timing of the tender must take into account Brown's offer to tender the entire amount received upon his termination, apparently with interest, on three separate occasions after the issue of ratification was first raised in Defendants' motion for reconsideration of the First Report.

Finally, an analysis of all the circumstances relevant to determining whether Brown disaffirmed the Release and tendered back the consideration within a reasonable time must include an examination of "the extent to which [his] delay was or was likely to be prejudicial" to Defendants. *Restatement (Second) Contracts* § 381 cmt. a (1981). While the specific provisions of a Vermont statute requiring notice of disavowal and tender of repayment of consideration by one seeking to disavow a release of claims for personal injury or death was held to trump any common law rules to the contrary, *Maglin v. Tschan-*

*nerl,* 174 Vt. at 46, 800 A.2d 486, the general rule respecting prejudice, invoked by the dissenting judge, went unchallenged:

> The courts ... have been very liberal in allowing the [releasor] to meet any requirement of notice of rescission or of timely tender back of the consideration. It is generally held that *bringing suit* for the later discovered injuries is *sufficient notice* and that a tender even after the action has been filed is timely, although it is usually stated that it must be *prior to trial. It has been recognized, and rightly so, that the important question is whether the releasee has been prejudiced by any delay.*

*Maglin,* 174 Vt. at 49, 800 A.2d 486 (Morse, *J.,* dissenting) (quoting *Casey v. Proctor,* 59 Cal.2d 97, 28 Cal.Rptr. 307, 378 P.2d 579, 589 (1963)) (final emphasis supplied; internal quotation marks omitted).

Whether there was reliance, or the likelihood of reliance, on the Release on the part of Defendants; whether the reliance was justifiable and, in this regard, whether Defendants knew of the grounds that Brown would advance for avoiding the Release; whether Defendants actually were at fault in inducing the execution of the Release by Brown; and whether Brown was at fault in not acting sooner to disaffirm and return the consideration present issues the resolution of which inform a determination of prejudice vel non.

## CONCLUSION

We remand this case to the District Court for further analysis of the issue of ratification in accordance with the foregoing. We leave it to the District Court after undertaking that analysis to determine whether the issue may be resolved on summary judgment or whether trial of the issue is required. Also, we do not preclude the District Court from examining

the other issues presented on the motion for summary judgment.